In The



Court of Appeals



Ninth District of Texas at Beaumont


____________________



NO. 09-07-559 CV


____________________



DSTJ, L.L.P., SUCCESSOR TO DSTJ CORPORATION


AND MILESTONE OPERATING, INC., Appellants



V.



M & M RESOURCES, INC., ENERGY LAND RESOURCES


A/K/A ENERGY LAND RESOURCES LAND SERVICES,


A.M. PHELAN, III AND DANIEL PHELAN, Appellees






On Appeal from the 60th District Court


Jefferson County, Texas


Trial Cause No. A-172,979






MEMORANDUM OPINION


 

 This is an accelerated appeal of an order modifying a temporary injunction. See Tex.
Civ. Prac. & Rem. Code Ann. § 51.014(a)(4) (Vernon Supp. 2007). In the trial 
court, M & M Resources, Inc. and DSTJ, L.L.P. assert competing claims to ownership of
mineral leases on a 210.5 acre tract in the Bennett Blackman Survey in Jefferson County,
Texas. (1) M & M obtained a temporary injunction to restrain operations on the tract which
includes the Quail No. 1 Well and the Quail No. 2 Well in the Frio 2 formation. See DSTJ,
L.L.P. v. M & M Resources, Inc., No. 09-06-073 CV, 2006 WL 1360509, *1 (Tex. App.--Beaumont May 18, 2006, no pet.). After we affirmed the granting of the temporary
injunction, the trial court modified the injunction to prohibit the appellants from performing
operations in the Frio 2 with the Quail No. 3 Well on the adjacent Gilliland tract. (2) In two
issues, the appellants, DSTJ and Milestone Operating, Inc., contend: (1) the trial court abused
its discretion by modifying the existing temporary restraining order to prohibit oil and gas
exploration, operations, and production on the Gilliland Survey; and (2) that the appellees,
M & M, Energy Land Resources, A.M. Phelan, III, and Daniel Phelan, failed to establish a
probable right to recovery and a probable, imminent, and irreparable injury. We affirm the
trial court's order modifying the temporary injunction.

 The purpose of a temporary injunction is to preserve the status quo of the litigation's
subject matter pending a trial on the merits. Butnaru v. Ford Motor Co., 84 S.W.3d 198, 204
(Tex. 2002). The decision to grant or deny a temporary injunction lies within the trial court's
sound discretion. Id. On appeal, we may not substitute our judgment for that of the trial
court unless the trial court's action was so arbitrary that it exceeded the bounds of reasonable
discretion. Id. Because the trial court did not enter written findings of fact and conclusions
of law, we presume all findings necessary to support the trial court's ruling and affirm if
there is any legal theory supported by the record. Davis v. Huey, 571 S.W.2d 859, 862 (Tex.
1978). The trial court does not abuse its discretion if some evidence reasonably supports its
decision. Butnaru, 84 S.W.3d at 211 (citing Davis, 571 S.W.2d at 862).

 The status quo is the last actual, peaceable, noncontested status which preceded the
pending controversy. Transport Co. of Tex. v. Robertson Transports, Inc., 152 Tex. 551, 261
S.W.2d 549, 553-54 (1953). The applicant must plead and prove three elements to obtain a
temporary injunction: (1) a cause of action against the defendant; (2) a probable right to the
relief sought; and (3) a probable, imminent, and irreparable injury in the interim. Butnaru,
84 S.W.3d at 204. The appellees' right to a temporary injunction was resolved in our first
opinion. See Hudson v. Wakefield, 711 S.W.2d 628, 630 (Tex. 1986) (Questions of law
decided on appeal to a court of last resort will govern the case throughout its subsequent
stages.); DSTJ, 2006 WL 1360509 at *4. (3) The issue in this appeal is limited to whether the
trial court may enjoin production by the same parties from the neighboring tract of land.

 The appellants contend that "The Rule of Capture, . . . forecloses M & M's right to
injunctive relief." Despite the disagreement regarding its application in this case, the parties
agree the rule of capture is well settled in Texas.

 In the light of modern scientific knowledge these early analogies [to wild
animals roaming upon the land] have been disproven, and courts generally
have come to recognize that oil and gas, as commonly found in underground
reservoirs, are securely entrapped in a static condition in the original pool, and,
ordinarily, so remain until disturbed by penetrations from the surface. It is
further established, nevertheless, that these minerals will migrate across
property lines towards any low pressure area created by production from the
common pool. This migratory character of oil and gas has given rise to the
so-called rule or law of capture. That rule simply is that the owner of a tract
of land acquires title to the oil or gas which he produces from wells on his
land, though part of the oil or gas may have migrated from adjoining lands. He
may thus appropriate the oil and gas that have flowed from adjacent lands
without the consent of the owner of those lands, and without incurring liability
to him for drainage. The non-liability is based upon the theory that after the
drainage the title or property interest of the former owner is gone. This rule,
at first blush, would seem to conflict with the view of absolute ownership of
the minerals in place, but it was otherwise decided in the early case of
Stephens County v. Mid-Kansas Oil & Gas Co., 1923, 113 Tex. 160, 254 S.W.
290, 29 A.L.R. 566. Mr. Justice Greenwood there stated, 113 Tex. 167, 254
S.W. 292, 29 A.L.R. 566:

 

 "The objection lacks substantial foundation that gas or oil
in a certain tract of land cannot be owned in place, because
subject to appropriation, without the consent of the owner of the
tract, through drainage from wells on adjacent lands. If the
owners of adjacent lands have the right to appropriate, without
liability, the gas and oil underlying their neighbor's land, then
their neighbor has the correlative right to appropriate, through
like methods of drainage, the gas and oil underlying the tracts
adjacent to his own."


 Thus it is seen that, notwithstanding the fact that oil and gas beneath the
surface are subject both to capture and administrative regulation, the
fundamental rule of absolute ownership of the minerals in place is not affected
in our state. In recognition of such ownership, our courts, in decisions
involving well-spacing regulations of our Railroad Commission, have
frequently announced the sound view that each landowner should be afforded
the opportunity to produce his fair share of the recoverable oil and gas beneath
his land, which is but another way of recognizing the existence of correlative
rights between the various landowners over a common reservoir of oil or gas.


 It must be conceded that under the law of capture there is no liability for
reasonable and legitimate drainage from the common pool. The landowner is
privileged to sink as many wells as he desires upon his tract of land and extract
therefrom and appropriate all the oil and gas that he may produce, so long as
he operates within the spirit and purpose of conservation statutes and orders
of the Railroad Commission. These laws and regulations are designed to
afford each owner a reasonable opportunity to produce his proportionate part
of the oil and gas from the entire pool and to prevent operating practices
injurious to the common reservoir. In this manner, if all operators exercise the
same degree of skill and diligence, each owner will recover in most instances
his fair share of the oil and gas. This reasonable opportunity to produce his
fair share of the oil and gas is the landowner's common law right under our
theory of absolute ownership of the minerals in place. But from the very
nature of this theory the right of each land holder is qualified, and is limited to
legitimate operations. Each owner whose land overlies the basin has a like
interest, and each must of necessity exercise his right with some regard to the
rights of others. No owner should be permitted to carry on his operations in
reckless or lawless irresponsibility, but must submit to such limitations as are
necessary to enable each to get his own. Hague v. Wheeler, 157 Pa. 324, 27
A. 714, 717, 22 L.R.A. 141, 37 Am.St.Rep. 736.


Elliff v. Texon Drilling Co., 146 Tex. 575, 210 S.W.2d 558, 561-62 (1948).

 The appellants argue the rule of capture gives DSTJ the right to develop the Gilliland
mineral estate and capture all oil and gas from operations as a vested right with
which M & M cannot legally interfere. The appellants cite Prairie Oil & Gas Co. v. State,
a case they argue contains facts identical to their own. See Prairie Oil & Gas Co. v. State,
231 S.W. 1088 (Tex. Comm'n App. 1921, judgm't adopted). In Prairie Oil, two permit
holders of the State were drilling for oil on state land. Id. at 1088. Prairie Oil filed trespass
to try title suits in Eastland County and obtained an injunction of production by one of the
permit holders and its assignees. Id. While an appeal was pending, the State filed a suit in
Travis County in which it sought to enjoin Prairie Oil from producing on adjacent land while
the permit holder was subject to the injunction. Id. at 1089. The intermediate appellate court
held the State was not a party to the Eastland County suits and could not be bound by its
judgment, but that Prairie Oil could be enjoined from drilling on its own land. Id. The
Commission of Appeals agreed the State was not a party to the Eastland County suits, and
could not be bound by it, but held Prairie Oil could not be enjoined in the Travis County suit. 
Id. at 1090. Noting that the State could, if its rights were imperilled, invoke the equitable
powers of the Eastland County Court, the Commission of Appeals held the State could not
enjoin Prairie Oil where Prairie Oil had obtained its injunction lawfully in the Eastland
County case. Id. at 1091. Significant to this analysis is the fact that Prairie Oil was not the
enjoined party in the first-filed suit, but was the party that had obtained the injunction against
another. Id.

 A similar result occurred in a case cited in Prairie Oil. See id. (citing Hermann v.
Thomas, 143 S.W. 195 (Tex. Civ. App.--Galveston 1911, no writ)). In Hermann, Thomas
won a suit against Hermann over title to land and Hermann appealed. Hermann, 143 S.W.
at 195. Hermann owned a neighboring tract from which Hermann had been developing oil
for many years. Id. Hermann's appeal prevented Thomas from leasing the minerals on the
land that was the subject of the litigation. Id. at 196. Thomas filed a petition for
appointment of a receiver and the trial court appointed a receiver with the power to produce
the minerals. Id. The appellate court held a cause of action did not lie for appointment of
a receiver independent of some other right. Id. Thomas argued his receivership petition was
ancillary to the suit for recovery of land, but he would not have been entitled to appointment
in that suit because Thomas had been the defendant. Id. at 197. Thomas was in possession
of the disputed property while the case was on appeal and Hermann had not done anything
that wrongfully interfered with Thomas's use and enjoyment of the property. Id. In
Hermann, the oil field had been in production before any of the litigation commenced. Id.
at 195.

 Both Prairie Oil and Hermann are distinguishable from the case presented here. The 
court intervention sought in those cases did not preserve the status quo. In Prairie Oil the
pre-existing injunction had not restrained the party affected by the new injunction. In
Hermann the status quo existing prior to litigation was the active production of minerals by
Hermann on his own land. In contrast, here the status quo when litigation commenced was
no active production of minerals by any of the parties, and DSTJ was the party restrained by
the first injunction. Although DSTJ would, under normal circumstances, be free to capture
the minerals that flowed from M & M's land, in this case the trial court had previously
determined a status quo of non-production and ordered the appellants to refrain from
producing the minerals during the pendency of the suit. The appellants were not producing
minerals from the Gilliland Survey at the time the trial court granted the initial temporary
injunction; drilling the Quail No. 3 Well disturbed the status quo of the parties to pre-existing
litigation. The appellants circumvented the trial court's order by doing something they were
not doing before the trial court enjoined them; namely, drilling a new well on neighboring
property for the purpose of producing the minerals they were prohibited from producing
under the first order. Under these circumstances, the trial court extended the physical scope
of the injunction in the exercise of its power to protect and control the pending litigation.

 The appellants contend that M & M failed to establish that operations on the
Quail No. 3 Well are likely to drain the Bennett Blackman tract. They argue that proof of
drainage required geological or engineering testimony by a qualified expert and that opinion
testimony by Robert Mayfield was speculative because he is not a qualified expert in geology
or engineering. As authority for their argument that expert scientific evidence was necessary
to establish M & M's right to the amended injunction, the appellants cite Kerr-McGee
Corporation v. Helton, 133 S.W.3d 245, 247 (Tex. 2004). Kerr-McGee concerned evidence
supporting the amount of damages claimed at trial on the merits, not the evidence necessary
to support a temporary injunction. Id. at 254. We determined in our first opinion that the
trial court could reasonably conclude that the threat of irreparable injury from production
pending trial justified the issuance of an injunction. See DSTJ, 2006 WL 1360509 at *3. The
issue here is whether the trial court could reasonably conclude that the threat of irreparable
injury extended to operation of the Quail No. 3 Well. (4)

 As part owner of M & M, Mayfield admitted that he could not testify as to the
operations a reasonably prudent operator should or should not do in the operations of the
Quail No. 3 Well, but his opinion that it would drain the Bennett Blackman tract was based
on documents the appellants submitted to the Railroad Commission. Those documents,
which appear in the temporary injunction record, show the two surveys sit upon a common
reservoir. In their response to the motion to modify the injunction, the appellants stated that
they commenced drilling the Quail No. 3 Well in September 2006, after the date of the initial
temporary injunction. They also stated that all three wells were completed in the Frio 2
sands. Because some evidence reasonably supports the trial court's decision, it did not abuse
its discretion in modifying the temporary injunction. See Butnaru, 84 S.W.3d at 211.

 Based on the record before us, DSTJ, L.L.P. and Milestone Operating, Inc. have not
shown in this appeal that the district court acted outside the bounds of reasonable discretion
in modifying the temporary injunction. See id. at 204. Appellants' two issues are overruled.

 AFFIRMED.




 ______________________________

 STEVE McKEITHEN

 Chief Justice 


 

Submitted on February 7, 2008

Opinion Delivered March 13, 2008


Before McKeithen, C.J., Gaultney and Kreger, JJ.
1. Energy Land Resources allegedly owns one of the leases. Two partners in Energy Land
Resources, A.M. Phelan, III, and Daniel Phelan, were brought into the litigation as third party
defendants. Milestone Operating, Inc. is the operator of the wells at issue in this litigation.
2. M & M assigned leases to DSTJ in both the Bennett Blackman and Gilliland Surveys, but
M & M's pleadings in the trial court only concern four leases in the Bennett Blackman Survey.
3. We determined that: (1) "[t]he trial judge was free to conclude that from March 2004 until
the end of October 2005, the status quo was that DSTJ and Milestone [the operator] had no ongoing
production or drilling operations on the disputed tract[;]" (2) "the trial court found M & M's
evidence concerning the threat of irreparable injury to be credible and sufficient to warrant a
temporary injunction despite appellants' evidence[;]" (3) "[v]iewing the evidence in the light most
favorable to the trial court's ruling, the record includes sufficient evidence of the threat of irreparable
harm if DSTJ is allowed to conduct operations before a trial on the merits[;]" and (4) "DSTJ and
Milestone have not shown in this appeal that the district court acted outside the bounds of reasonable
discretion in granting the temporary injunction." DSTJ, 2006 WL 1360509 at *1, *3-*4.
4. In a reply brief, the appellants argue that the appointment of a receiver would supply an
adequate remedy at law to protect against drainage, making an injunction unnecessary. We
understand them to argue that M & M could have requested a receiver be appointed for the Bennett
Blackman Survey, not the Gilliland Survey at issue in this appeal. Our previous opinion affirmed
the trial court's injunction against producing oil on the Bennett Blackman tract, and we will not
revisit issues regarding the property affected by the original order in our review of the modification
of the injunction.